# Wheeling.

## McConaughy v. Camden *et al.*

### Decided May 14, 1881.

#### *(Absent, Johnson, Judge.)

Where parties have made a final settlement of all matters between them, it will not be opened by a court of equity, unless one of the parties was guilty of fraud, or a mutual mistake was made by them, and a suit for its correction was brought promptly by one of the parties on the discovery of the mistake.

Appeal from and *supersedeas* to a decree of the circuit court of the county of Wood, rendered on the 8th day of January, 1877, in a cause in said court then pending, wherein William McConaughy was plaintiff and J. N. Camden and others were defendants, allowed upon the petition of said McConaughy.

Hon. J. M. Jackson, judge of the fifth judicial circuit, rendered the decree appealed from.

Moore, President, furnishes the following statement of the case:

The appellant, McConaughy, and John Jones, at rules in the circuit court of Wood county, July, 1873, filed their bill in chancery against J. N. Camden, in his own right, and J. N. Camden, W. P. Thompson and W. N. Chancellor, partners under the name and style of J. N. Camden & Co.; E. P. Chancellor, trustee, and the National Bank of Parkersburg, in which bill complainants alleged, that in 1865 they entered into co-partnership at Burning Springs, Wirt county, for the production of oil, and for that purpose had acquired a large amount of property, consisting in part of lease-hold estates, engines, tubing, tankage, bulk boats, &c., among which there were two leases and wells on each, which leases and wells were respectively designated by numbers 118 and 208, appertaining to which were steam engines, tubing and other necessary appliances; that on or about March 14, 1866, well 118 was bored and completed, which flowed oil at from 200 to 250 barrels per day gradually diminishing in quantity for

---

*Counsel in court below.

about two years, since which time its production has been by pumping;—that about May 15, 1866, well 208 was bored, and flowed oil at the rate of from 800 to 900 barrels per day for about six weeks, varying in production, then pumped for a short time, when it again flowed about 500 barrels per day with occasional suspensions, and continued to produce oil in gradually diminishing quantities up to the last two years;—that complainants acquired five eighths of well 52, the other three eighths belonged to one N. T. McConaughy; that complainants acquired an undivided one half interest in number 224, and the entire interest in Nos. 204, 130, 178, 190, 198, 119, 214 and 232, the said 224 and 204 were at first flowing wells and produced many thousand barrels of oil; that they also about the year 1865 acquired the fee simple of 5½ lots in Parkersburg, from Joseph Wetherell; that on June 4, 1866, said J. N. Camden applied to them to be admitted into their firm, and he was received into the partnership to the extent of one sixth of the aforesaid partnership property, except in said 118, its engine, tubing, &c., and except also the said Wetherell lots; the name of the firm was then changed to McConaughy, Jones and Camden, in which name its business was carried on until the dissolution thereof;—that the terms, conditions, &c., of the co-partnership, were fully agreed upon and distinctly understood by, and between its members, and it was then and there agreed, that the said Camden should reduce them to writing; that among other provisions, it was distinctly understood and positively agreed upon, to be incorporated in the articles of co-partnership, that Camden in consideration of the one-sixth interest was to transfer to McConaughy and Jones $14,000 in gas-stock or bank-stock, and he was to furnish all the money that was necessary to carry on the business of said partnership of whatever amount, without trouble, inconvenience and without interest for the same to complainants;—that Camden then represented, that he was experienced in handling oil, and had at hand all the money that would be necessary to prosecute the business to the amount, if needed, of $80,000 or $100,000, and claimed that it would take that amount of money to run said wells during the summer, when nothing could be realized on production by reason of inability to get them to market during low water;—that it was also agreed, that McConaughy

was to have charge of the office of the firm at Parkersburg; that Jones was to have charge of the affairs at Burning Springs, and that Camden was to furnish all the money necessary to carry on the business of the firm without any charge to complainants for interest on the same;—that within a short time after the making of said agreement said Camden called complainants into his private back room in the First National Bank in Parkersburg, and requested them to be seated, and he then produced a paper, which he said was the article of copartnership that he had previously agreed to prepare; it was in Camden's own handwriting and of considerable length; he then read aloud to complainants, what purported to be its contents, and, among other things, read or represented the provisions as being therein contained in relation to his obligation to furnish all the money necessary to carry on the business of the partnership, as before stated; that the article was then signed by complainants and Camden, without having been read by complainants, Camden professing to be in a great hurry to take the train for Baltimore, and promising to furnish a copy to them when he returned. Complainants repeatedly called upon him for a copy, but he failed to give it.

Complainants obtained information, how not remembered, that the article as written was essentially different from the article as read, one important difference being that the written article wholly omitted the provision obligating said Camden to furnish the money necessary for carrying on the business of the firm, free from interest, cost and charge, and which was one of the expressed stipulations of the agreement, and the principal inducement to complainants to take Camden into the firm, and which stipulation was read to them by Camden as being contained in said article, but complainants are informed, and believe and charge, that said provision is omitted therefrom; and they charge, that said omission was wilfully and fraudulently made by said Camden for the purpose of injuring complainants in the premises, and that his pretended haste and want of time to furnish a copy thereof, when he pretended to read said article, was all a cunning and false pretence acted out successfully to beguile complainants into signing it, which he well knew they had never assented to, and never would have signed but for his artful deception in

the premises.   They charge that said article is not the agree-
ment made between them and the said Camden, and that be-
ing deceived into signing it, they are not bound by its pro-
visions so far as they differ from the true and actual agreement
between them.

Complainants further charge, that for the purpose of more
effectually defrauding them of their just rights and profits in
the premises, Camden soon after signing the pretended arti-
cle of co-partnership entered into and formed another co-
partnership, composed of himself, Wm. P. Thompson, who is
his brother-in-law, and W. N. Chancellor, who did business
under the name and style of J. N. Camden & Co.; that Cam-
den was president and Chancellor was cashier of the First
National Bank of Parkersburg, and that they held these offi-
ces long anterior to the date of the article of co-partnership,
and long after the giving of the deeds of trust in the bill men-
tioned, and to the giving of the notes in said deeds named
and of the notes in renewal of the same.

Complainants also charge, that the firm of McConaughy,
Jones & Camden, on June 9, 1866, obtained from James M.
Stephenson and wife, in consideration of the sum of $8,875.00,
a deed for seventeen and three fourths acres of land situated in
the county of Wood, in which deed was retained a lien for
said purchase-money, which deed is exhibited with the bill;
that on September 15, 1866, said firm together with said Ste-
phenson conveyed by deed to John A. McComber about two
acres of said land for the sum of $2,750.00, (deed exhibited
with bill); and on the 22d day of October, 1866, said com-
plainants and Camden deeded to Godwin Van Winkle for
$2,750.00 about two acres of said land, (deed exhibited with
bill); that on November 28, 1866, they deeded to Newberger,
Braidon & Co., for $2,750.00, about two acres of said land,
(deed exhibited); that after these alienations were made, there
remained about nine and three fourth acres of the seventeen
and three fourth acres, after setting aside about two acres of
the tract for an oil-yard, which was subsequently conveyed to
J. N. Camden January 9, 1867, by deed, for $6,000.00, (deed
exhibited with bill); that McConaughy, on June 4, 1866,
purchased of Godwin Van Winkle a house and lot in Parkers-
burg, for $19,000.00 and also said Van Winkle's household

furniture in the same for the sum of $2,836.61, (deed exhibited) ; that about same time said McConaughy executed to W. W. VanWinkle a deed of trust to secure to said Godwin VanWinkle, the payment of the notes which had been given for said purchase-money of said house and lot, two of which notes were for $5,000.00 each, and one for $9,000.00 ; the household furniture was paid for by McConaughy ;—that immediately upon the formation of their partnership with Camden, complainants in good faith commenced and continued to carry on its business ; that a very large amount of oil was produced by them, aggregating many thousand barrels ; that soon after they began, McConaughy went to the company's office at Parkersburg to take charge of it according to the arrangement and agreement aforesaid, where Camden introduced McConaughy to William P. Thompson as the person having charge of the office ; said Thompson continued to have charge of the office and books of the company from that time until the dissolution, assisted by one Alfred Schilling, each of whom charged to the firm, the sum of $100.00 per month for their services without the consent of complainants ; that Camden, pretending to act as one of the firm, received and disposed of all of the company's oil which was shipped from Burning Springs to Parkersburg, the value of which, received by him, amounted to at least from $60,000.00 to $100,000.00

Complainants charge, that Camden, in several instances, received lots of oil shipped by complainants to him, and had the same credited on the books of the firm, at such prices as suited him ; that he would then sell the same, as opportunity offered, to the credit of either J. N. Camden, or J. N. Camden & Co., and in some instances to the credit of complainant's firm ; and that where such lots of oil were sold to the credit of J. N. Camden, or J. N. Camden & Co., they were sold at a price and profit much above the amount which he had allowed complainants firm for the same, thereby realizing great profits either to himself individually, or to the firm of J. N. Camden & Co., which he never accounted for to the firm of complainants, and which justly and legally belong to their said firm, and for which Camden should be made accountable.   They also charge that Camden used said oil-yard, its engines, machinery, tanks, pumps, coal and appliances

generally, without complainant's consent for the convenience and advantage, either of himself, individually, or for J. N. Camden & Co., for which he is accountable, &c. They allege that Camden did not furnish the money necessary to carry on the business, without interest, charge or cost, as by the terms of the partnership he was bound to do, except $2,000, furnished June 5, 1866, which he again drew out of the concern on the 18th of same month, and $1,000, in November, 1866, on account of the oil-yard; and he drew out of the funds of the company $1,900, for use of himself and said Jones, between June and October of same year; and while acting as partner with complainants, he engaged in various speculations, either individually or with others; of this kind, he purchased oil-property, consisting of leases and wells, and paid for same in part, at least to extent of $1,900, which he drew from the funds of McConaughy, Jones & Camden; that complainants expressed their dissatisfaction to him as soon as they discovered the fact, and never consented for him to do so.

On January 10, 1867, Camden desired a dissolution of the partnership, to effect which he proposed to sell to complainants his one sixth interest therein, (except the oil-yard and the Stephenson property) and a written article of agreement was then entered into, setting forth the terms by which said dissolution was effected, (which agreement, a copy of, is exhibit H. of the bill,) in which it was provided that Camden should convey to complainants his entire interest ($\frac{1}{6}$) except said oil-yard and the Stephenson land, in consideration that complainants should pay off all the liabilities of the firm, amounting as therein stated to $22,500, (itemized in the bill), and also all the outstanding debts not embraced in the itemized schedule mentioned in the bill, except a balance due on cost of oil-yard, and the two thirds of the cost of the ground occupied by same; that complainants not having the money to liquidate these debts, it was agreed that Camden should pay them off, for which complainants were to execute to him their notes for said $22,500, less their interest in the oil-yard, &c., transferred to him at the price $4,000, leaving the amount for which their notes were to be given $18,500 to be secured by deed of trust; complainants executed to Camden their six notes, three for $4,000 each, three for $2,166,66⅔

each, and to secure which a deed of trust was executed, a copy of which is exhibited with the bill. Complainants paid off each of the notes for $4,000, "and a considerable portion of the remaining three notes of $2,166.66⅔ each ; that Mc-Conaughy loaned to Camden $3,000,00, before the first note given to Van Winkle became due, (which money McConaughy had for the purpose of paying off said note), which Camden promised to pay to Van Winkle when his said note became due, but he failed to pay the money to Van Winkle, and has never paid it to either of complainants ; that McConaughy paid off to Van Winkle the first two notes, each for about $5,000.00 ; that when the $9,000.00 note became due, Van Winkle became very urgent for his money, and threatened to enforce the trust if it was not paid, and that McConaughy being embarrassed financially at the time, a fact well known to Camden, Camden proposed that he would take up the trust aforesaid, and hold the same until it was convenient for McConaughy to pay it, provided complainants would convey to him all their interest in the residue of the Stephenson land, which they did by deed on the 7th of October, 1867, (exhibited with the bill) ; that the actual value of the Stephenson land was $11,274.43, which sum, less Camden's interest therein, as a member of the firm, was the enormous price paid Camden for forbearance of Van Winkle's debt for about sixteen months.

They allege, that Camden sold the said land under said trust, (claiming to have lifted it) to S. P. Wells for $9,000.00, by which means he acquired complainants' interest in the Stephenson land without any other consideration than the delay to enforce the trust for sixteen months; and they charge that the members of the firm of said J. N. Camden & Co. had full knowledge of said usury in the sale aforesaid and were parties to it; that about October 3, 1866, said Camden took oil belonging to McConaughy, Jones & Camden, thirty-six thousand one hundred and ten gallons net, which he sold in his own name at fourteen cents per gallon, amounting to $5,055.40, and received the money therefor, which he never accounted to complainants for. Complainants allege that the said $22,500.00 set forth in exhibit H, as indebtedness of the firm, was not correct, and that they signed said statement in total ignorance

and mistake of the true state of said indebtedness, which mistake was brought about either mistakenly or fraudulently by the said Camden, who at the time represented the same to be correct, and bound himself in said article to furnish complainants a detailed statement of all the oil received on account of said co-partnership, and how and in what manner the proceeds arising from the proceeds of the sale thereof was applied, accompanied by the vouchers, and to make good any discrepancy between sales and applications within ten days from date of exhibit H, but he has wholly neglected and refused to furnish said statement. They charge that the indebtedness to Exchange Bank of Weston was not $4,000.00, but only $2,000.00; and to Bowen & Mercer was not $5,500.00, but only $3,642.92, making an error of $3,857.08, in these two charges alone, which complainants bound themselves to pay by the terms of said exhibit H, which paper was executed by them in ignorance of the facts, and by mistake; and they charge that Camden knew, at the time exhibit H was drawn up, that it contained the errors above indicated; and he also knew that the books of the company, which were in his charge, and under his control at the office in Parkersburg, would afford conclusive evidence of other transactions wherein complainants have been wronged in their dealings with said Camden, by which, they are advised, they are not precluded from having a full, thorough and complete investigation of their entire partnership affairs, notwithstanding the provisions in the latter part of said exhibit H, which, complainants assert, were there inserted at Camden's instance for a fraudulent purpose, as he knew the true condition of said partnership affairs, and misled complainants by his erroneous statements concerning them, and thereby led them to sign the article under mistaken conceptions of the real facts.

Complainants charge, that Camden erroneously charged McConaughy, Jones & Camden, and had improperly allowed to him in their transactions $1,383.08, it being for interest on some of the moneys constituting said $22,500.00, alleged indebtedness of the firm; he having agreed to furnish all money necessary for the business of the firm, is personally chargeable on all sums of money borrowed for the firm by him, he having failed to furnish the same according to the partnership

agreement. Complainants, file as exhibit "K," a detailed statement of all the foregoing items, together with other items not specifically set forth in the bill, which are proper charges against him upon a just and full settlement of their partnership transactions; that complainants, in ignorance of the errors aforesaid, proceeded to pay off the indebtedness of the firm, supposing it to be correctly stated in exhibit "H," but not being able to fully do so, in strict literal compliance with the terms of exhibit "H," they from time to time renewed the notes they had given, paying the discount and charges thereon, together with as much of the principal as they could, and in the meantime, because further indebted to J. N. Camden and J. N. Camden & Co. and others, to secure the payment of which complainants executed another deed of trust March 2, 1868, (a copy of which is exhibited), and they allege, that said last trust includes the balance of supposed indebtedness secured by trust-deed of January 10, 1867, which is, as they believe and charge, held and claimed by the First National Bank mentioned in exhibit "L;" that assuming the indebtedness to have been all right and proper, which was secured by said trust "L," it has been paid off and discharged, except $4,700.00, exclusive of interest; but the truth is, that upon a fair settlement there is nothing due either J. N. Camden, J. N. Camden & Co. or the First National Bank, but said parties are justly indebted to complainants not less than $20,000.00 and that whatever notes are held by said bank against complainants are subject to all equities against them in their hands by reason of the fact, that Camden was president of the bank at the time the notes were given, or the notes of which there are the renewal, and that W. N. Chancellor was cashier of said bank, both of whom had full knowledge of all the equities pertaining to the same, and further that said trusts were given to secure in part indebtedness thereafter to be incurred, which trusts are void because forbidden by the national banking law.

The bill then alleges, that Edward P. Chancellor, trustee in trust-deed marked "L," has proceeded to advertise the property mentioned in said deed for sale, to take place on June 12, 1873, &c., and they pray that he be inhibited and enjoined from proceeding to sell the property so advertised by him

for the reasons before in the bill set forth, and because said property is not advertised as required by law ; and especially from selling the three eighths interest of one N. T. McConaughy ; they pray a settlement, &c., and that the article "H" be declared fraudulent, and be set aside and annulled.

The foregoing are substantially the allegations of the bill. (which bill, I must say, is not as concise in its allegations as it should be).

On June 5, 1873, Judge Jackson granted the injunction prayed for. Process issued, returned executed, and at July rules 1873, a decree *nisi* was entered and bill taken for confessed at August rules 1873, and cause set for hearing. (Such of the exhibits as are necessary, will be considered in the opinion).

On January 12, 1874, J. N. Camden & Co. and the First National Bank filed their demurrer to the bill, and it was set for argument ; and J. N. Camden tendered his answer ; which was ordered to be filed, by which he says :

" It is true that the said William McConaughy and John Jones were the owners of oil-property at Burning Springs, substantially as described in said bill of complaint, and that the well number one hundred and eighteen was the first devolopment of oil by what is termed a deep well in the territory know as the Burning Spring territory. Number one hundred and eighteen was a flowing well of about one hundred barrels of oil per day when first struck, and some time afterward it was followed by well number two hundred and eight, which gave promise of being a very large flowing well, estimated at from five hundred to seven hundred barrels of oil per day. These wells were obtained at a depth of from seven hundred and fifty to eight hundred and fifty feet, and were supposed to correspond with what is known as the third sandstone of the Pennsylvania oil territory, the wells from which were very productive and lasting. Respondent had not then for some time been engaged in boring and working-oil wells, but went to Burning Springs at the solicitation of the plaintiffs, or one of them, to look at the new wells, and whilst there, the said Jones explained to respondent the necessity of having assistance in procuring money to take care of the oil and manage the business, which led

finally to respondent's purchasing a one sixth interest in all the territory, except number one hundred and eighteen as stated in complainant's bill, at the price of $14,000.00, respondent stating that he could obtain all the money necessary to take care of the oil and carry on the business.

The purchase being completed, respondent took a contract of assignment of one-sixth interest in all the property embraced in said purchase and in the business of McConaughy & Jones, and respondent does not now recollect whether there was any other paper or contract of co-partnership drawn up between them or not, but respondent became a member of the firm of McConaughy, Jones & Camden, which was formed immediately after said purchase. Respondent avers, that he has diligently searched amongst his papers, and that he has been unable to find any contract of purchase or agreement of co-partnership between himself and said McConaughy & Jones, and respondent believes, that said contract and agreement was filed with the leases and other title-papers to the said oil-property in the office of McConaughy, Jones & Camden, and when the said firm was dissolved on the 10th day of January, A. D. 1867, it passed into the possession of McConaughy & Jones, or William McConaughy with the other papers in the office, and is now in the possession of the said William McConaughy, or it has been lost or destroyed.

Respondent avers and charges, that the $14,000.00 was to be in full consideration of one sixth interest in said property, and that he was to pay no furthur *bonus*, interest or money necessary to be used by said firm in their business, or to pay any other thing for said one sixth interest in said property ; and respondent denies emphatically, that he ever agreed to furnish any money for said business free of interest; and he denies, that he ever agreed to put any individual money into said business. The property was a producing oil-property, and it was expected that the production would be very large and the receipts from the oil greatly in excess of the expenditures so soon as the necessary tankage, boats and barrels were obtained for taking care of and marketing the said oil, and that said receipts would not only pay all necessary expenses, but would in a short time pay back the capital invested, which in respondent's purchase was estimated at $84,000.00.

"Respondent further answering, saith that he told the complainants, that he could and would obtain for them all the money necessary to take care of said oil and carry on the business until the oil could be got to market, but respondent denies that he ever agreed to assume any greater obligations or any other responsibility than attached to him as a member of the firm of McConaughy, Jones & Camden to the extent of his one sixth interest. Respondent agreed to obtain the money necessary because his credit and acquaintance enabled him to do so, and he avers that he did procure large sums of money upon his endorsements and credit for the benefit of said firm, a large portion of which he had eventually to pay from his own means.

"Respondent further answering, says that it is not true, that he ever at any time refused to let the plaintiffs, or either of them, see the alleged article of co-partnership or agreement, and respondent avers that no copy was ever demanded ot or requested of him after it was signed, and he avers that the allegation in complainants' bill, that this respondent deceived and wrongfully read the said partnership agreement to said McConaughy is false and untrue, and this respondent believes the said McConaughy knows it to be untrue and without any foundation whatsoever. Respondent states, that the said purchase was made by him on the 4th day of June, 1866, and the said partnership continued until the 10th day of January, 1867, and that upon the dissolution of the same a full settlement was made and reduced to writing, as shown by exhibit "H" (hereinbefore copied) filed with the bill, after which settlement the complainant, McConaughy, engaged the services of Colonel Hoffman Atkinson, a competent book-keeper, to examine and settle the books of the said firm of McConaughy, Jones & Camden, who did in connection with N. T. McConaughy, the son of said complainant, examine and settle the same and reported said examination and settlement, which was received, and all the books and papers belonging to said firm were turned over to and placed in the possession of said McConaughy & Jones at that time. And afterwards, to-wit on the 29th day of March, 1869, another settlement was made, and, in pursuance of these two settlements, payments were made from time to time on their indebtedness, beginning

with the first, extending through a period of six years, and yet in all that time no such claims as set up in the complainants' bill were ever made save and except the single item of the 36,110 gallons of oil referred to in the said report of Col. Hoffman Atkinson, which was fully explained at the time and settled in the settlement of March 29, 1869, when it was understood between the parties and expressly stated, that all matters between the said complainants and this respondent prior to said 29th day of March, 1869, of every character whatsoever had been adjusted, and that there was nothing outstanding which could be made the subject of defence in the enforcement of the trust-deed ; and the respondent avers that the first time any such claims as those alleged in complainants' bill have been made or brought to his notice was by the filing of said bill of complaint ; and this fact, together with the fact of the said two settlements, is conclusive evidence that said claims are wholly false.

" Respondent, further answering says, that some time in the year 1866, he contracted with James M. Stephenson for the purchase of about seventeen acres of land adjoining the city of Parkersburg, for the sum of $8,875.00, and after said purchase was made respondent stated to the complainants that if they desired to do so, they could each have an equal interest in the purchase with him, and a portion of it could be used as an oil-yard ; they then expressed a desire to become interested in said purchase, and it was concluded in the name of Wm. McConaughy and John Jones equally, and not in the name of McConaughy, Jones & Camden, as alleged in the complainants' bill; of the said land between two and three acres were laid off and set apart as an oil-yard, to be used by said firm of McConaughy, Jones & Camden; of the residue of said land about two and three fourths acres was sold to McComber, Taber & Co. at $2,750.00 cash, which sum was used by McConaughy, Jones & Camden ; another lot of about two and three fourths acres was sold to Godwin Van Winkle at $2,500.00 ; another lot was sold to Braidon & Newberger at $2,500.00, which two last named sums were paid to James M. Stephenson on the purchase-money and accrued interest on the same, leaving about seven and one half acres, exclusive of the oil-yard, which had been conveyed in January, 1867,

instead of nine and three fourths acres, as alleged in complainants' bill.

"Respondent, further answering, saith, that after the said purchase by him on the 4th day of June, 1866, and the formation of the firm of McConaughy, Jones & Camden, the said firm, anticipating a large production of oil, made large expenditures for taking care of it by providing tankage, bulk boats and fitting up a yard at Parkersburg for receiving it, and this respondent, for the purpose of meeting these expenditures, borrowed the money necessary for the firm upon his own endorsement. Respondent states that the said wells, instead of meeting the anticipation formed in regard to their production and durability, soon began to fall off materially in their yield and in a very short time became pumping wells of moderate production. The expectations of McConaughy & Jones had been large and exaggerated, and they conceived that they had already in their hands a large fortune, when, in fact, they were both in debt, and the fortune was only in anticipation. Both were extravagant in the use of money and in contracting debts. The said McConaughy had in the meantime purchased the Godwin Van Winkle property, described in complainants' bill, paying and agreeing to pay for the same, nearly $22,-000.00, when in fact it was worth less than half the amount. The firm had contracted debts for which respondent was individually responsible as endorser to the amount of nearly $40,000.00, and the wells not yielding sufficient oil to allow any considerable portion of it to be diverted from the payment of the firm-debts to the individual use of the said McConaughy, and respondent foreseeing that his own sixth interest in the said firm might be the cause of serious embarrassment to himself, explained the necessity to the said McConaughy and Jones of making no new debts or expenditures, and of applying the productions and all available means to the payment of the firm-debts; and the situation and condition of the affairs of said firm were fully canvassed ; and finally respondent made the proposition to give his entire interest in the property, and furnish all the money to pay off the amount which had been borrowed for the use of the firm as set forth in exhibit "H" (hereinbefore copied.) Respondent avers that the several sums named in said exhibit "H" were at the

time owing by said firm, and they were all paid by respondent, and especially the sum of $4,000 was owing to the National Exchange Bank at Weston, and was paid by respondent on the 2d day of February, 1867, which said note and respondent's check in payment for the same drawn on the First National Bank, Parkersburg, is herewith filed marked exhibit "No. 1."

"And respondent further avers that the draft drawn on Bowen & Mercer for $5,500, and discounted by the First National Bank, Parkersburg, for the benefit of McConaughy, Jones & Camden was owed to the said bank, and was paid by respondent on the 30th day of March, 1867, and respondent files herewith his check which paid the same, marked Exhibit "No. 2."

"And respondent, further answering, says that the said amount was separate and distinct from and in addition to the said sum of $3,653, which was a debt due to said Bowen & Mercer. Respondent saith that the said draft for $5,500 was drawn on Bowen & Mercer for the purpose of being discounted at the said First National Bank for the credit of McConaughy, Jones & Camden, and that it was discounted and placed to their credit on the 19th day of December, 1866.

"And respondent further saith that the said draft was not accepted by Bowen & Mercer, nor was it intended to be; the said bank discounted the same on the endorsement of respondent, and with the understanding that respondent would take it up, which respondent did do by paying the same on the 30th day of March, 1867, as aforesaid. Respondent avers that the agreement and dissolution of partnership, dated the 10th of January, 1867, and filed with complainants' bill, marked exhibit "H," was a final settlement, expressly stated to be in gross, of all the partnership matters of the firm of McConaughy, Jones & Camden, with the single exception that said Camden was to furnish a statement of all the oil received by him from said firm, and the manner in which the proceeds had been applied within ten days from that date. And respondent avers that in order to make said settlement and close the partnership business he made very large concessions to the complainants.

"Respondent further states that immediately after the sign-

ing and conclusion of said agreement of 10th January, 1867, he proposed to the complainants that he would deliver to them, or to any person they would select, all the books and papers of the firm for examination and investigation, and they could make the report as required by said agreement instead of respondent; this proposition was readily acceded to by complainants, and they employed Col. Hoffman Atkinson for that purpose, who had the assistance of Wm. P. Thompson, N. T. McConaughy and D. B. Bernard, who was superintendent of the oil-yard and shipping; and after a long and careful examination of the books, Col. Atkinson reported the books correct, and all the oil accounted for except 36,110 gallons which did not appear on the books. Respondent then explained that the oil had been shipped by respondent to pay a balance due Bowen & Mercer, of Baltimore, by the firm of McConaughy, Jones & Camden, and that the entry had not yet been made upon said books. This explanation seemed satisfactory, and the books being correct in all other respects, respondent, without ever having seen the books or papers in the office of the firm after the 10th day of January, 1867, directed that they should all be turned over to said McConaughy & Jones, which was done, and this respondent has never since seen said books, or the papers connected with the business of said firm.

"Respondent, further answering, says that the allegations in complainants' bill that there was an error of $3,857.08 in the two items, viz., of the four thousand due the exchange Bank at Weston, and the draft for $5,500 on Bowen and Mercer is false and untrue; and this respondent avers the truth to be that about the time of the dissolution of said co-partnership on the 10th day of January, 1867, there was due to Bowen & Mercer $3,642.92 (and proved by the depositions of Wm. McConaughy and N. T. McConaughy taken in the cause), and respondent had shipped and sold the said 36,110 gallons of oil to discharge said indebtedness, and that the highest market value of oil was ten cents per gallon, as shown by the contract of said 10th January, 1867, and that the proceeds of the sale of said oil amounted to the sum of $3,611.00, being $31.92 less than the sum due Bowen & Mercer; and respondent avers that he settled and paid to said Bowen &

Mercer, for the firm of McConaughy, Jones & Camden, the said sum of $3,642.92, about the first day of February, 1867, as stated in complainants' deposition. Respondent avers that said indebtedness of $3,642.92 to Bowen & Mercer was independent of and formed no part of the draft for $5,500.00 discounted at the First National Bank, Parkersburg, the said sum of $3,642.92 being a debt due to Bowen & Mercer on their books for advances made, and the $5,500.00 was a draft drawn on the 19th December, 1866, by McConaughy, Jones & Camden at thirty days, and which was discounted on that day by the First National Bank, Parkersburg, and the proceeds placed to their credit, and said draft was never sent forward, to be paid or collected from Bowen & Mercer but was retained by said bank at Parkersburg, and was paid by this respondent to the said bank.

"Respondent, further answering, says that all the debts named in exhibit "H," dated 10th January, 1867, and filed with complainants' bill, were due and owing by the firm of McConaughy, Jones & Camden, as there stated, and the same were paid in full by this respondent.

"Respondent further states that while the said sum of $22,500.00 was due as stated in said agreement and was paid by him, the said McConaughy and Jones never executed their notes to him but for the sum of $18,500.00; that the said McConaughy claimed, the day after said article was prepared, that respondent ought to pay $2,000.00 of the money borrowed from the National Exchange Bank, Weston, on account of some money that complainant, McConaughy, claimed that he should pay; and this respondent then and there explained that there was no reason in the demand, but, nevertheless, respondent conceded the deduction of the $2,000.00 and at the same time the said McConaughy made further claims for deduction for reasons not distinctly remembered, amounting to $2,000.00 more, making $4,000.00, which was allowed by respondent, and the amount thus deducted from $22,500.00 to $18,500.00. Respondent avers that there was no merit in either of these claims made by the said McConaughy, and there was no reason or justice in respondent's allowing said claims under the said contracts, but knowing that he had the $22,500.00 to pay under any circumstances, and

feeling the absolute necessity for dissolving his connection with said firm, and knowing that it was then in debt to the amount of $30,000.00 at least, and that the payment of these debts would fall upon him, and that he would be compelled to pay them all, and knowing further that the debts of the firm were increasing daily, and that his efforts to provide money for the use of the firm were well nigh exhausted, and that if the business was continued he would certainly be involved in financial embarrassment and compelled to sacrifice his property to meet the increasing debts of the firm, he was willing to make almost any concessions demanded of him to effect a full settlement of the affairs and business of the firm of McConaughy, Jones & Camden, and knowing also that if he even got back the sum of $18,500.00 he would have reason to congratulate himself, he accepted their notes for $18,500.00 in settlement instead of $22.500.00 as named in the agreement.

"Respondent further avers that in addition to the said amounts named in complainants' exhibit "H," except the $1,500 to the First National Bank, Parkersburg, he paid on the 23d day of January, 1867, to the credit of McConaughy, Jones & Camden in the said First National Bank, to make good their account, the sum of $6,722.65, which said sum made up the amount to be paid by respondent for the oil-yard, and the said $1,500.00 as mentioned in said exhibit "H," and on the 9th day of January, 1867, J. N. Camden & Co. deposited to the credit of said McConaughy, Jones & Camden in said First National Bank the sum of $2,301,80, which was the sum due for the seven hundred barrels of oil sold to J. N. Camden & Co., as stated in said exhibit "H," the said two sums amounting to nine thousand and twenty four dollars and forty five cents ($9,024.45), being the exact amount that the account of McConaughy, Jones & Camden stood overdrawn in said bank at that time.

"Respondent, further answering, saith that he denies that the firm of J. N. Camden & Co. had any existence until near the time of the dissolution of the firm of McConaughy, Jones & Camden had been determined upon, and he avers that the said article of co-partnership bears date the 1st day of December, in the year 1866, and no transactions relating to the busi-

ness of said co-partnership were made until some time subsequent to that day.

"And this respondent further avers that all the charges and allegations of fraud, collusion and unfair dealing in complainants' said bill of complaint contained relating to the firm of J. N. Camden & Co. are wholly untrue and without foundation in fact; that the said firm of J. N. Camden & Co., did not exist prior to the 1st December, 1866, when the dissolution of the firm of McConaughy, Jones & Camden had been determined upon.

"Respondent, further answering, saith that it is true complainant, Wm. McConaughy, purchased from Godwin Van-Winkle the property named in the bill and at the price therein stated, and made to the said Van Winkle the payments therein alleged, until the principal of the said debt was reduced to nine thousand dollars ($9,000.00), and the said McConaughy being unable to pay to said Van Winkle the said sum of $9,000.00 with the interest on the same, and the said property being about to be sold under the trust-deed importuned respondent and the firm of J. N. Camden & Co. to take up the deed of trust of Godwin Van Winkle and hold it for a year, stating that within that time he could ascertain whether he could pay for the property or hold it, and if not, then he would in the meantime arrange to sell it at private sale. To this request respondent and J. N. Camden & Co. hesitated, and for some time refused to do it, stating their apprehensions that the property would not bring the amount of the Van Winkle debt. J. N. Camden & Co. did, however, arrange with Godwin Van-Winkle for the debt against complainant, McConaughy, and on the 7th October, 1867, took said Van Winkle's assignment of said deed of trust, without recourse, and also a note of $201.61 from said McConaughy to said Van Winkle, which said note the said Van Winkle required to be taken up also. The said J. N. Camden & Co. held the said debts against the said McConaughy until March, 1869, when, finding the said McConaughy was hopelessly unable to pay for said property, the said J. N. Camden & Co., urged and advised him to sell the same to one S. P. Wells, who had made him what respondent considered a liberal offer, and as an inducement to him to make the sale, the said J. N. Camden & Co. agreed

to take the $9,000.00 in discharge in full of the whole indebtedness under the trust, amounting at that time to about $11,200. making a loss to them of about $2,200.00, as is shown by the agreement of 29th March, 1869, herewith filed marked exhibit "No. 3;" and respondent believes and avers that if the said property had not been sold to said Wells at that time, the said J. N. Camden & Co. would have sustained a loss of from $4,000 to $5,000 on said deed of trust instead $2,200.00, as the said McConaughy was then and still is insolvent.

"Respondent further shows and states that on the 29th day day of March, 1869, respondent and J. N. Camden & Co., and complainants, McConaughy and McConaughy & Jones, had a further settlement of all the various matters connected with their business, which was full and satisfactory ; at which time J. N. Camden & Co. gave said McConaughy their check for $348.10 in settlement in full for all matters and transactions prior to the said 29th March, 1869, which said agreement and settlement the said Wm. McConaughy, for himself and for McConaughy & Jones, and J. N. Camden & Co. and respondent, executed and signed, and the same is herewith filed marked exhibit "No. 4," and in that settlement it will appear that the item of 36,110 gallons of oil was especially referred to again, and the certificates of Col. Atkinson, D. B. Bernard and Col. Thompson were returned to respondent and cancelled, complainant having been long satisfied of the proper application of the proceeds of said oil to the indebtedness of McConaughy, Jones & Camden, and respondent files herewith the cancelled certificate marked "No. 5."

"Respondent further shows that on the 7th day of October, 1867, the complainants, Wm. McConaughy and John Jones, and respondent conveyed to J. N. Camden & Co. the residue of the land purchased of James M. Stephenson, which consisted of about seven and a half acres of the seventeen and three fourths conveyed by James M. Stephenson ; lots containing a fraction over two and a half acres, each were conveyed to John B. McComber, Godwin Van Winkle, and Braiden and Newberger, making something over seven and a half acres ; the oil-yard which had also been conveyed on the 9th of January, 1867, contained nearer three than two acres,

making from ten to ten and three quarters previously sold, and leaving unconveyed at that time only about seven to seven and three fourths acres of said land. This respondent avers that said land was not the property of the firm of McConaughy, Jones & Camden, but the same was the individual property of Wm. McConaughy, John Jones and J. N. Camden. The most valuable and available portion of the said seventeen and three fourths acres had been sold prior thereto and occupied as the oil-yard. A large portion of what remained was low ground and was subject to overflow, and was less valuable in proportion than the other lots. The purchase-money unpaid, including interest, was about $4,000.00. And the said J. N. Camden & Co., in addition to the purchase-money to be paid to the said James M. Stephenson, paid the said McConaughy a certain amount of money, how much this respondent does not now remember, and the fact that the sum of $2,750.00 paid by McComber and Taber for the lot purchased by them, was used by the firm of McConaughy, Jones & Camden, of which sum respondent was entitled to one third part, and having only one sixth interest in said firm was taken into consideration, the actual amount of purchase-money was greater than the consideration named in the deed.

"Respondent, further answering, saith that he denies emphatically that complainant, McConaughy, ever loaned him $3,000.00, or any other sum in money or oil. The only oil-transaction he ever had with McConaughy and Jones during the existence of the firm of McConaughy, Jones & Camden was credited on the books of the firm, and settled by the dissolution thereof on the 10th day of January, 1867. Respondent saith that the allegation made in complainants' bill that the Stephenson purchase was made by the firm of McConaughy, Jones & Camden, and for their benefit, is false and untrue and is a sheer fabrication, as is evidenced by the deeds filed marked exhibit "L" in complainants' bill (hereinbefore copied), and is also shown by the notes executed to James M. Stephenson and signed by the parties individually.

"Respondent, further answering, says that the allegation in complainants' bill that this respondent was to pay off the debts named in exhibit "H" amounting to $22,500.00 less

the costs of the oil-yard transferred to respondent at the price of $4,000.00, leaving the indebtedness for which the notes were to be given by complainant at $18,500.00 is false and untrue, as is evidenced by said exhibit "H," which plainly states the indebtedness at $22,500.00, after deducting the cost of the oil-yard and its appurtenances, and seven hundred barrels of oil sold to J. N. Camden & Co.

"Respondent, further answering, saith that the allegation in complainants' bill, that the firm of J. N. Camden & Co. was formed soon after the firm of McConaughy, Jones & Camden, and that respondent sold large quantities of oil to them from McConaughy, Jones & Camden at fraudulently low prices, is false and untrue, having nothing whatever of truth in it. No such firm as that of J. N. Camden & Co. was brought into existence until about the time of the dissolution of the firm of McConaughy, Jones & Camden had been determined upon. These gross and reckless assertions of important facts, alleged by complainants to be true, but which from necessity cannot be true, are in keeping with the misstatements made throughout the bill.

"Respondent, further answering, says that the allegations contained in complainants' bill that this defendant appropriated the money of the firm to buy oil-property for himself is false and untrue.

"And respondent, further answering, saith that it is not true that he acquired nine and three fourths acres of land without consideration whatsoever, except for the delay to enforce said trust-deed for the period of sixteen months; on the contrary, this respondent avers that he never received any land or other thing for or on account of the forbearance of that trust; and he avers that he sustained a heavy loss on the same, as hereinbefore stated.

"And the defendant, further answering, saith that is not true he ever contracted debts for himself and others and paid the same from the funds of said partnership, without having accounted for the same; and this respondent avers that in all his transactions with the said firm his acts and dealings have been strictly correct and honest, and his connection with said firm has resulted in great loss to him. And respondent avers he has given the said complainants every opportunity to ex-

amine and scrutinize the accounts of McConaughy, Jones &
Camden, and he has always furnished them all the informa-
tion possessed by him in relation to their partnership busi-
ness and transactions, and that all the books and papers be-
longing to said firm have been in the possession of said com-
plainants not in any way subject to the control of respondent
since the dissolution of said partnership up to the present
time—a lapse of nearly seven years, and during that period
two full complete settlements have been made to wit, on the
10th day of January, 1867, and on the 29th of March, 1869,
in which settlement every claim now made by complainants'
bill was considered, canvassed and fully and completely set-
tled, which settlements were reduced to writing and signed
by the parties; that of the 10th day of January was the deed
of complainants signed and sealed by them, and they now
falsely pretend that the said settlements are tainted with
fraud on the part of this defendant; and this respondent be-
lieves, and has good reasons to believe, that the complainants
have alleged fraud and error in said settlements solely for
the purpose of making a case for the jurisdiction of this court,
in the hope that said settlements may be set aside, and that
then it may be impossible, after the lapse of seven years, for
this respondent to show in detail all the numerous transac-
tions of said partnership; but this defendant is advised that
a court of equity will hold that said settlements are final, and
that said complainants are concluded by them in the absence
of proof of fraud or palpable error.

"And now, having fully answered complainants' bill, and
denying all and all manner of unlawful combination and con-
federacy, and denying all fraud and unfair dealing, as, in
their bill the complainants have alleged, this respondent
prays hence to be dismissed with his reasonable costs in this
behalf expended. And he will ever pray, &c."

Such of the exhibits as are necessary for the consideration
of the case are referred to in the opinion.

On July 14, 1874, the court entered the following decretal
order:

"The demurrer filed in this cause at the last term and set
down for argument by an order made at said term being lost
out of the papers, by consent and agreement of counsel, the

defendants have leave to substitute said paper to be acted upon by the court at a future term. And this cause came on this day to be heard upon the bill and answer, and replication thereto, the depositions and proofs taken in the cause, and the exhibits filed, and was argued by counsel. On consideration whereof, the court is of opinion that no proper decree can be rendered in this cause without a reference to Barna Powell, Esq., a master commissioner, who is directed to ascertain whether any fraud was committed by either of the parties to this cause in making the settlement of the 10th of January, 1867, filed as exhibit "H," and to ascertain further whether any fraud, mistake or error was committed in making the other settlements between said parties whereby any sums or other matters were improperly or erroneously included or excluded. Said commissioner is directed to treat said settlement "H" as conclusive unless the proofs filed in the cause show fraud; and the other settlements between them are to be taken as conclusive unless fraud, error or mistake be shown by the proofs in the cause, and if such fraud be shown in said other settlement 'H,' or if fraud, error or mistake be shown in the other settlements between the parties, then said commissioner is to report in what such fraud error or mistake consists, and make a report to the court of a settlement between said parties corrected of any such fraud, error or mistake; and make report of any matter deemed pertinent by himself or required by either party."

Said commissioner made his report accordingly, and reported, among other matters, that there was no intentional fraud in the settlements between the parties, but that the evidence disclosed some mistakes, the result of omission not intentional, for which neither party is to blame, which mistakes he aims, in his report, to specifically point out. The defendants filed the following exceptions to said report, July 17, 1874:

"1st Exception.—For that the said commissioner hath found that there was no fraud in the settlement of the 10th January, 1867, but notwithstanding the finding of that fact, he proceeds to show said settlement, and reports large sums of money in favor of complainants in consequence of mistakes in said settlement, when the proof is conclusive that every

claim of complainants was fully canvassed and settled between the parties to said settlements at the time of the said settlements thereof.

"2d Exception.—For that the said commissioner has reached his conclusions by consideration of improper and illegal testimony objected to by defendants' counsel, which objections were made at the time of the examination of witness, and are appended to said depositions, and bear date September 18, 1874.

"3d Exception.—For that said commissioner has based his report upon testimony given of the contents of the books of the firm of McConaughy, Jones & Camden without having the books produced for examination and inspection of defendants, as he was requested to do by defendants' counsel. Wherefore the said defendants except to the said master's report, and humbly appeal therefrom to the judgment of the honorable court."

J. N. Camden & Co., on December 17, 1874, by permission of the court given on record, at the June term, 1874, filed their demurrer to complainants' bill to supply its loss from the file, which had been set down for argument at said term ; and said Camden tendered a special plea in writing, alleging that the cause of action arose more than five years before the filing of their bill of complaint, or the serving or suing out process against said defendants to appear to and answer said bill ; and for cause of demurrer, said J. N. Camden & Co., showeth that it appears by the said bill that the same is exhibited against these defendants as co-partners as aforesaid, and against J. N. Camden individually as one of the members of the firm of McConaughy, Jones & Camden, the First National Bank Parkersburg, and E. P. Chancellor, for several distinct matters and causes, in many whereof, as appears by the said bill, these defendants, co-partners as aforesaid, are not in any manner interested or concerned, by reason of which distinct matters, the plaintiffs' said bill is drawn out to considerable length, and these defendants are compelled to take a copy of the whole thereof, and by joining distinct matters together which do not depend upon each other in the same bill, the proceedings, orders and pleadings will in the progress of said suit be intricate and prolix, and

these defendants put to unnecessary charges in taking copies of the same, although several parts thereof no way relate to or concern them, for which reason and for divers other errors appearing in the bill, these defendants do demur thereto, and they pray the judgment of this honorable court whether they shall be compelled to make any further or other answer to the said bill, and they humbly pray to be hence dismissed with their reasonable costs in their behalf sustained.

On January 8, 1877, the court entered the following decree :

"It appearing to the court that John Jones, one of the plaintiffs, has departed this life since the institution of this suit, it is ordered that his death be suggested on the record, and that this cause do proceed in the name of Wm. McConaughy, as surviving partner, and the demurrer to complainants' bill being argued by counsel and considered by the court, the same is overruled ; and this cause coming on now to be further heard upon the bill and exhibits filed therewith, and the plea and answer of defendant J. N. Camden and the exhibits filed therewith and the general replication to said answer, and the plea of First National Bank of Parkersburg, and the depositions and proofs taken in the cause, and the report of Commissioner Barna Powell, and the exceptions to said report, was argued by counsel. On consideration whereof the court is of opinion that so much of said commissioner's report as ascertains that there were no frauds in said settlement of 10th day of January, 1867, should be and is hereby confirmed. And the proof taken in the cause satisfying the court that there was no error or mistake in any of said settlements, and that the settlement of the 10th day of January, 1867, was a settlement in gross, and that the matters stated in said report were canvassed and settled between the parties at the time the settlements were made, the court is of opinion that the exceptions of defendant to said commissioner's report are well taken, and the same are sustained. And the court is further of opinion that the plaintiffs, by reason of the lapse of time, are not entitled to recover in this action, as it appears from the evidence taken in the cause that the plaintiffs have been in possession of, and in the use and enjoyment of all the interest of the defendant, J. N. Camden, in said oil-property which was pur-

chased by him on the 4th day of June, 1866, from the complainants, and re-conveyed by him to them on the 10th day of January, 1867, and that all the assets of the firm of McConaughy, Jones & Camden were also transferred and set over to complainants by the contract of dissolution of co-partnership, also dated on the 10th day of January, 1867, the parties could not be placed in the position in which they stood at the time of said dissolution, and that no decree could be made opening up said settlement, without prejudice to the rights of the parties, or some one of them : It is, therefore, adjudged, ordered and decreed that the injunction heretofore granted in this cause be and the same is hereby dissolved and the bill dismissed, and that the defendants recover their costs by them about their suit in this behalf expended."

Appeal and *supersedeas* were granted the said Wm. McConaughy upon said last decree, thus presenting the case to this court upon the following assignment of errors :

" 1st. It was error in the court to allow the plea of the statute of limitations to be filed in this case after the same had been unreasonably delayed for nearly two years after the institution of the suit, and after the commissioner's report had been filed in the cause and all of the evidence had been taken, and the cause was ready for hearing.  8 W. Va., 459.

" 2d. The plea was filed as to J. N. Camden alone, and therefore could not avail as to the other defendants.

" 3d. It could not avail as to J. N. Camden, because of the fraud charged and proved against him.—*Hunter* v. *Hunter*, 10 W. Va.

" 4th. It was error to dismiss the bill as to the First National Bank, Parkersburg, because said bank neither plead to nor answered the bill.  The bill as to said bank was taken for confessed, and decree should have been given against it.

" 5th. It was error to dissolve the injunction and dismiss the bill as to the defendants, J. N. Camden & Co., because they never answered the bill.  They appeared and demurred to the bill, which demurrer was overruled.  The bill then stood as taken for confessed as to J. N. Camden & Co., and decree should have gone against them.

" 6th. That it was error upon the merits of the cause to dissolve the injunction and dismiss the bill, but the Court should

have decreed for the amount found by the commissioner against the defendants, as the commissioner's report in that respect was fully sustained by the evidence, and the said notes secured by the trust were held by the First National Bank, Parkersburg, subject to all the equities between the complainants and the original holders thereof, said bank having had notice thereof through its president, the said J. N. Camden, and its cashier, the said W. N. Chancellor.

" 7th. It was error to dissolve the injunction as to the First National Bank, but the same should have been perpetuated as to it because the national banking law forbids the execution of such a trust."

*Loomis, Hutchinson* and *Sands* for appellant cited the following authorities: 2 Rob. (old) Pr. 277; *Id.* 303; *Id.* 322-325; 6 Johns. Chy. 139; 1 Dan. Chy. Pr. 352 and cases cited; *Id.* 680; 7 W. Va. 380; 10 W. Va. 321; 6 Wheat. 481; Code ch. 104 § 6; 1 Story 204; 3 Johns. Chy. 384; 7 Johns. Chy. 90; 1 Paige 616; 4 Munf. 332; 10 Gill and J. 65; 1 Hopkins Chy. 471; 1 Rand. 73; 1 Johns. Chy. 10; 5 W. Va. 50; 2 Dan. Chy. Pr. 1300; 1 Stockt. 309; *Id.* 659; 14 Vt. 514; 5 Grey 423; 7 Cush. 223; 10 Pick. 298; 36 Me. 115; 5 Ind. 422; Story Eq. Pl. §§ 798-802; 1 Dan. Chy. Pr. 689; 12 Leigh 434; Angel and Ames Corp. 306; 4 Hill 451; 1 Hill 480; 22 Pick. 24; 19 Vt. 410; 32 Vt. 341; 1 Green Chy. 117; 3 N. Y. 156.

*W. H. Small* for appellees cited the following authorities: Rev. Stat. U. S. § 5137; Story Eq. Pl. § 279; 5 Paige 65; 4 Cow. 682; Code ch. 104 § 6; *Id.* § 14; 7 Paige 197; 10 W. Va. 321; Kerr on Fraud (Bump's Ed.) 48; *Id.* 306; *Id.* 422, 423; *Id.* 346; *Id.* 335, 336, 436; *Id.* 298, 299; Story Eq. Juris. §§1539, 1561; 8 W. Va. 429; 1 Greenl. § 88.

Moore, President, announced the opinion of the Court.

Before treating of the assignment of errors made by the appellant, it is proper to consider, whether the court erred to the prejudice of the defendants, J. N. Camden & Co., by overruling their demurrer. The objection to the bill as raised by the demurrer is, that it was multifarious. It must be borne

in mind that the *gravamen* of the bill is fraud and mistake, of which subjects equity always takes jurisdiction ; and as the bill shows upon its face, that it is seeking relief against certain fraudulent acts, affecting all the parties, by having interwoven the individual and partnership affairs of McConaughy, with the partnership affairs of J. N. Camden & Co., McConaughy, Jones & Camden, and the bank, and Camden individually, it is plain that no proper and full settlement or disentanglement could be had without the presence of all of them before the court, and for that purpose a court of equity afforded a proper forum ; and the bill in thus presenting such a state of facts, is not demurrable on the ground of multifariousness. Even if it should occur upon the merits of the case, that the bill did in fact include individual matters not pertinent to the true issues in the cause, I apprehend such impertinent matters might be stricken therefrom, or totally ignored by the court, without debarring equitable cognizance of the other matters pertinent to the case.—*Brinkerhoff* v. *Brown*, 6 Johns. Ch. 139; Code 1868, ch. 125, §29.

It is true that, "though a bill be multifarious, and but vaguely states the matter on which relief is sought, consent by the parties to an interlocutory decree that the cause be referred to a commissioner ,to audit, state and settle an account of the amount due each of the plaintiffs, is a waiver of any objection to such irregularity, and a demurrer thereafter for such cause is properly disallowed," as decided in *Bittenhouse* v. *Harman*, 7 W. Va. 380, yet, I do not think, that where a party consents that his demurrer may be acted upon at a future time, and permits the court, before it acts upon the demurrer, without objection, to render a decree of reference of the cause to a commissioner, acting upon the other papers and pleadings in the cause, that thereby he has waived the benefit of his demurrer. The case in that respect is very different from the case of *Bittenhouse* v. *Harman;* there the demurrer was not tendered until after the verdict, but here it was tendered and filed before the order of reference, but having been lost, time was given to restore it, but not permitted to delay the case. Whilst the practice is not a desirable one, and is irregular, yet I cannot consider it equivalent to a waiver.

The first, second and third assignments of error, made by

the appellant, are in reference to the filing of the plea of the statute of limitations, by J. N. Camden. Chapter 125 § 53, Code, 1868, says : ." At any time before final judgment or decree, a defendant may file a plea or answer, but if the same be not filed in due time, an action or suit shall not be thereby continued, unless the court shall for good cause so order." The plea was filed at a court held December 17, 1874; the interlocutory decree referring the cause to the commissioner had been made July 14, 1874; the report of the commissioner bears date November 12, 1874, and was filed in the cause December 5, 1874, and the defendants filed their exceptions to the report, December 17, 1874, at the same time that Camden filed said plea. The final decree was not entered until January 8, 1877. The plea was filed in ample time to be considered by the court in connection with the commissioner's report, and to have the force it was entitled to, in case fraud should not be established by the proofs. It was filed long anterior to the final judgment, and could not have tended to a continuance or delay of the cause ; nor does it belong to that class of cases to which the doctrine laid down in *Elliott* v. *Hutchinson,* 8 W. Va. 452, is applicable.

Although the *gravamen* of the bill's allegations be fraud, yet as it prays a settlement of the partnership accounts and the defendant in his answer denies the charge of fraud, putting the complainant to proof, it is proper for him to meet a stale demand, if such it be, with the plea of the statute of limitations, if he wishes to do so; and it is sometimes just and proper to do so, because a complainant may by his own laches suffer such a lapse of time as to prevent the defendant from disproving the allegations of the bill in conseqence of the death of witneses, loss of papers, defect of memory, &c. He who seeks equity must do equity, and nothing should be more obnoxious to a court of equity than *laches* of the complainants. If he has had ample opportunity to know the truth of the case, and that the defendant has made a mistake, or made, what seems to him, an unfair settlement, it is his bounden duty to declare it within a reasonable time, and if he does not declare it in due time, so as to enable the defendant to explain and correct it, but rests upon his oars for years, keeping it a secret within his own breast, it seems to me but right that equity should interpose the bar, which a

wise rule of law gives for the prevention of frauds and for repose from vexatious litigation.   Therefore, where parties have made a final settlement of all matters between them, it will not be opened by a court of equity, unless one of the parties was guilty of fraud, or a mutual mistake was made by them, and a suit for its correction brought promptly by one of the parties on the discovery of the mistake.

To meet the other assignments of error, it is not necessary to take up time in the consideration of each separately, because as the *gravamen* of the bill is fraud and mistake, a consideration of the case upon its merits satisfies my mind that the decree complained of was in the main correct, and that the assignment of errors was ill-advised.   Wm. McConaughy introduced himself as a witness, and substantially testified, in chief, in the language of the allegations of his bill, but upon cross-examination and re-examination he is indefinite, confused and uncertain, to such an extent, indeed, as to so weaken his case in the eye of the court as to justify it in dissolving the injunction and dismissing the bill, if his testimony alone was taken.

Camden answered the bill, positively denying or explaining the material allegations of the bill, and by his own testimony at least neutralizes the testimony of the complainant and substantiates by vouchers and exhibits his own.   Jones's testimony is of similar intent and effect as McConaughy's, but is more of the argumentative style than is generally sanctioned in depositions.   N. T. McConaughy, son of complainant testified, at great length twice, the last time without an order of the court for re-taking his deposition, and to a great extent gives oral evidence to prove the contents of books that are in his possession and of writings, without producing them, as the rule of evidence requires, as the best evidence, or accounting for their non-production.   The defendants properly excepted to his deposition in that respect.   But all that is immaterial in the view that I take of this case.

Camden claims that all of the stipulations and understandings of the partnership were embraced in the written agreement of June 4, 1866, filed as exhibit "Q," with Van Winkle's deposition; which, together with the assignment, &c. thereon, dated January 10, 1867, is as follows.

"This contract, made this 4th June, 1866, between Wm. Mc-Conaughy and John Jones, of the first part, and J. N. Camden, of the second part, witnesseth:

"That the said McConaughy & Jones have this day sold to said Camden the one undivided sixth part of all their oil property at Burning Springs, except as hereinafter stated, the said interest consisting of nine leases obtained from the Baltimore and Burning Springs Oil Co., viz: Lot No. 208, upon which is situated the largest Jones flowing well; also lots Nos. 130, 178, 190, 214, 220, 194, 76 and also the half of 224, and the whole of No. —, known as the White leases; also 204 obtained from Conley; also 119 and No. —, known as the Folsom lease; also one sixth interest in No. 52, with engines and appurtenances.   It being the object and intention of the parties to this contract to transfer to said Camden a clear one sixth interest in all their oil leases and oil business at Burning Springs, to date from the time the flowing well was struck on said lot 208, the said Camden to have his interest free from all expense and liabilities up to that time, and also to be entitled to one sixth interest in all engines, fixtures, tanks, tools, and their appurtenances on hand belonging to the oil business, as well as all the product from said flowing well, but it is understood that the said Camden is to pay one sixth of all the expenses incurred or purchases of material made since the date at which said flowing well was struck.   And it is further understood that the flowing well on lot No. 118, together with its appurtenances, and the product therefrom is excepted from and not included in this contract.   In consideration whereof, the said Camden pays the sum of two thousand dollars in cash, and binds himself to have transferred to the said McConaughy & Jones two hundred and fifty shares of stock in the Parkersburg Gas Company, the capital stock of the said company being in shares of fifty dollars each, making in the aggregate the sum of fourteen thousand dollars as aforesaid.

"Witness the following signatures and seals.

"Wm. McConaughy, [seal.]
"John Jones,        [seal.]
"J. N. Camden.     [seal.]

"*Know all men by these presents,* That I, J. N. Camden, of the city of Parkersburg, State of West Virginia, in considera-

tion of the premises and the sum of five dollars in hand paid, the receipt whereof is hereby acknowledged, have assigned and by these presents do assign unto William McConaughy and John Jones, of the same place, all my right, title and interest in and to the within instrument of writing, and every clause, article or thing therein contained; and I hereby constitute the said McConaughy & Jones my attorneys, but to their own use, to take all legal measures which may be proper for the complete recovery and enjoyment of the assigned premises, with power of substitution : and the said consideration agreed to be paid to the said McConaughy & Jones by the within contract is hereby acknowledged in full.

"Witness the following signatures and seals this 10th day of January, A. D. 1867.

"J. N. CAMDEN,        [SEAL.]
"WM. McCONAUGHY, [SEAL.]
";JOHN JONES.        [SEAL.]
"STATE OF WEST VIRGINIA,
        "Wood county, ss.:

"I, W. W. Van Winkle, a notary public for the county of Wood, State of West Virginia, do certify that J. N. Camden, Wm. McConaughy and John Jones, whose names are signed to the above writing, bearing date on the 10th day of January, A. D. 1867, have severally acknowledged the same before me in my county aforesaid.

"Given under my hand this 11th day of January, 1867.

"W. W. VAN WINKLE,
        "Notary Public."

The deposition of Van Winkle, referred to, being right to the point, as I understand this case, I give it in full :

" 1st. Question—State whether you were present at the dissolution of the firm of McConaughy, Jones & Camden, and whether you drew the agreement of which exhibit " H " purports to be a copy; and if so, where is the original? And state all you know about the terms of the dissolution.

" Answer—I was present at the dissolution on the 10th day of January, 1867, when the contract, of which exhibit " H " is a copy, was drawn. I drew the agreement and made the copy filed as exhibit " H." The original is in my possession and was left with me by the parties to the contract to be kept.

I have compared the copy filed with the original, and find it to be correct.   We were employed one whole day and part of the night and part of next day in the negotiations relating to the dissolution.   And I think the contract, a copy of which is marked " H," embodies the terms that were then and there agreed upon.   It was intended by the parties to be a full and final settlement of all things pertaining to the partnership, except as to the oil which is excepted in the agreement.

" 2d Question—Was that contract read over and its terms canvassed and understood by all the parties at the time it was executed, and was anything said about any specific debts mentioned and referred to in that paper ?

" Answer—My recollection is that it was read over, its terms canvassed, and I think, understood by the parties.   I don't recollect anything being said about any of the debts except the draft drawn on Bowen & Mercer.   In making up the specific debts to be paid by Mr. Camden it was claimed by either Jones or McConaughy, or both, that the Bowen & Mercer debt had been paid, or that it was a private debt of Mr. Camden's and should not go into this contract.   It was finally understood and agreed to be a debt of the firm and was put in this contract to be paid by Mr. Camden.

" 3d Question—Was there a deed of trust executed by Mc-Conaughy & Jones to secure J. N. Camden in the payment of the firm debts ?

" Answer—There was a deed of trust executed to me as trustee.

" 4th Question—The debts named in exhibit " H " to be paid by J. N. Camden, amounted to $22,500.00; the amount secured by the deed of trust was only $18,500.00.   Can you explain why the amount agreed to be paid J. N. Camden was less than he agreed to pay?

" Answer—I don't remember the reason of making the deduction ; but I do remember that there was a claim made, and Camden consented to allow it, making a remark that he would take the $18,500.00 in order to have it settled.

" 5th Question—In exhibit " H " it was provided that J. N. Camden was to render a statement of oil within ten days. What understanding was there had at the time to refer the

books to Col. Atkinson to make the statement instead of having it made by Camden?

" Answer—Either at the time, or shortly afterwards, preference was expressed to have the statement made by an accountant; and Hoffman Atkinson was selected to make the statement.

"6th Question—Examine exhibit 'No. 5,' filed with J. N. Camden's answer, and say whether it is in Hoffman Atkinson's hand-write and where he now is?

"Answer—It is in his hand-writing, except memorandum across the face; and the signature, I take to be his. He has been in Japan the part of two or three years. His father informed me about ten days ago that he was still there.

"7th Question—Have you the contract of purchase of June 4, 1866, by J. N. Camden of his interest from McConaughy & Jones, and the assignment of Camden's interest back to them? If so, please produce it.

"Answer—I have a contract in my possession which I here produce and file marked exhibit "Q."

"W. W. Van Winkle."

Exhibit "H," referred to in Van Winkle's deposition and filed with the bill of complainant, is as follows:

"This agreement, made this tenth day of January, 1867, between William McConaughy and John Jones, of the first part, and Johnson N. Camden, of the second part:

" *Whereas*, by the terms and conditions of a certain contract, bearing date on the fourth day of June, 1866, wherein the said McConaughy and Jones sold to said Camden an interest in certain leases on lots therein numbered and specified, amounting to one sixth part thereof, and reference being had thereto will more fully appear; and

" *Whereas*, it was the object and intention to transfer to the said Camden an interest, amounting to one-sixth in all of the leases therein mentioned, and in all their business at Burning Springs, and also entitle him to the like interest in all engines, fixtures, tanks, tools and other appurtenances; and

" *Whereas*, it has been mutually agreed between the said William McConaughy and John Jones and J. N. Camden to dissolve the connection existing by force of the said contract; and

"*Whereas*, it appears that the co-partnership created by the said contract stands indebted to sundry persons in the sum of twenty-two thousand five hundred dollars, in the manner following, viz: a debt to Solomon Prager for the sum of $5,500.00; a draft drawn on Bowen and Mercer of Baltimore for the sum of $5,500.00; a note in the Exchange Bank, at Weston, W. Va., for the sum of $4,000.00; one other note in the Merchants' National Bank of Wheeling for the sum of $5,000.00; a balance due the First National Bank of Parkersburg, for overdrawn account, after deducting the cost of oil-yard and its appurtenances, and seven hundred barrels of oil sold to J. N. Camden & Co., amounting to the sum of $1,500.00; and a note to James Montgomery, superintendent, for the sum of $1,000.00: Now these presents, witnesses, and it is truly covenanted and agreed, in consideration of the premises, that the said co-partnership and all dealings and transactions relative thereto, shall, from the day of the date thereof, cease and determine, and that the terms and conditions of the said contract shall from thenceforth be absolutely null and void; and in consideration that the said William McConaughy and John Jones will furnish the said J. N. Camden three thousand barrels of petroleum or rock oil of forty gallons each, in the manner following, to-wit: one thousand barrels in sixty days from the date hereof; one other lot of one thousand barrels within four months from the date hereof; and a third lot of one thousand barrels within six months from the date hereof, for all of which the said Camden agrees to pay ten cents per gallon when delivered by the said McConaughy and Jones to him at Parkersburg, but it is understood that in the event more than the specified number of barrels is delivered on the appointed day, then the said Camden is to pay cash at the then market price per gallon, for all the oil in excess of said quantity delivered to him; and if the said McConaughy and Jones shall further deliver to the said Camden at Parkersburg a certain other number of barrels of oil of forty gallons each, in quantities of six hundred and fifty barrels each, respectively in eight, ten and twelve months from the date hereof, then the said Camden shall pay, and he hereby agrees to pay, the cash market price per gallon whatever it may be on the day of delivery. It is understood that the said McConaughy and Jones shall have the option of deliv-

ering the oil agreed to be delivered in greater quantities than herein specified on the appointed days, and at any time prior thereto; the said Camden giving the said McConaughy and Jones cash or a credit for such excess, whichever they may elect. But it is provided, always, and it is hereby agreed, that all the oil to be delivered to be transported in boats from Burning Springs to Parkersburg, and in case the navigation of the Little Kanawha river shall be impeded or obstructed by ice, or rendered impossible of navigation on account of low water, the said McConaughy and Jones are to be allowed such additional time for the delivery of the specified quantities of oil as is required to render the said river in a navigable and boatable condition. The said J. N. Camden hereby covenants and agrees for himself and personal representatives to assume all liability for the debts hereinbefore specified, and to defray, pay off and cancel the same whenever they shall respectively become due and payable, and such as are already due and payable; and to secure the said McConaughy and Jones against all loss or damage by reason of the signing or endorsements already made in the co-partnership name to and on any of the notes and drafts mentioned in the foregoing schedule, and to save and keep harmless and indemnified the said McConaughy and Jones, their and each of their executors and administrators, against all and every persons whatsoever to whom they are indebted by reason of the said co-partnership signatures and endorsements above referred to, and of and from all actions, suits, costs, damages, charges, judgments, executions and demands whatsoever which shall arise or come [against them, the said McConaughy and Jones, by reason thereof; and further, that in consideration that the said J. N. Camden gives unto the said McConaughy and Jones all his right, title and interest in and to the leases and co-partnership goods owned by him by virtue of the contract hereinbefore referred to, and the interest he has in the leases and co-partnership goods on the Jones and Deevers' farm, including his undivided one fourth interest in lot No. 52, owned jointly with John Jones, and executes to the said McConaughy and Jones a sufficient *deed of assignment,* with relinquishment of dower for all of the property above mentioned, and gives the said McConaughy and Jones all the oil in bar-

rels and tanks and now produced or producing at Burning Springs, then the said McConaughy and Jones, for themselves, their executors and administrators, agree to pay all the outstanding debts of the said co-partnership not embraced in the foregoing schedule except the balance due on the cost of oil yard and the two thirds of the cost of the ground occupied by the same ; and for the consideration aforesaid the said J. N. Camden agrees to receive and receipt for all oil when delivered to him at Parkersburg, in whatever quantities and at any time, which the said McConaughy and Jones may buy at Burning Springs or elsewhere, and to accept all orders for money to pay for the same at its cost price at the wells, when the said oil is delivered at Parkersburg, and all money in excess of the buying and the market price on the day of delivery shall be set by the said Camden as a credit on the account of the said McConaughy and Jones ; and the said Camden, for the consideration aforesaid, further agrees to furnish the said McConaughy and Jones a detailed statement of all the oil received on account of the said co-partnership, and how and in what manner the proceeds arising from the sale thereof were applied, accompanied by the vouchers for such applications, and hereby binds himself, his executors and administrators to make good any discrepancy between the said sales and applications to the said McConaughy and Jones, the said statement to be rendered within ten days from the date hereof; and the said McConaughy and Jones are to collect and receipt for and retain in their own right all claims which are now due, and owing to the said co-partnership ; and it is understood that the terms and conditions of this agreement when performed are to be the final settlement of all of the accounts of the said co-partnership between the parties thereto, without any reference whatever to the books of said co-partnership, the object of this contract being to make a settlement in gross, on the terms that the said Camden paying the debts herein enumerated to be paid by him, and the said McConaughy and Jones assuming and paying all other outstanding liabilities against the said co-partnership, with the exceptions herein mentioned.

22

"Witness the following signatures and seals:

"Wm. McConaughy,  [SEAL.]

"John Jones,     [SEAL.]

"J. N. Camden,   [SEAL.]

"State of West Virginia, "*Wood County:*

"I, W. W. Van Winkle, a notary public for the county of Wood, and State of West Virginia, do hereby certify that Wm. McConoughy, John Jones and J. N. Camden, whose names are signed to the writing hereto annexed, bearing date on the 10th day of January, A. D. 1867, have severally acknowledged the same before me in my said county. Witness my hand this 11th day of January, 1867.

"W. W. Van Winkle,

"*Notary Public.*"

Exhibit number "5," referred to in the aforesaid deposition, as an exhibit with Camden's answer, is as follows:

"Parkersburg, W. Va., Feb. 28, 1867.

"Mr. J. N: Camden,

"*To McConaughy & Jones,*                    Dr.

"To net 36,110 gal. oil @ 14c. per gal.............. $————

"I certify that the above bill is correct, as shown by the books (from the oil-yard) of shipments of oil as kept by Mr. D. B. Bernard, and call attention to the attached certificate of Col. W. P. Thompson, under whose directions the transactions involving the amount (36,110 gallons) occurred.

"Hoffman Atkinson,

"*Accountant of McConaughy & Jones.*

"Parkersburg, *Feb'y* 28, 1867."

"This will certify that I have shipped from oil-yard for J. N. Camden 36,110 oil net out of McConaughy, Jones & Camden's oil, which am't was not cr. McC., J. & C.

" D. B. Bernard,

"*Supt. at Works.*

"Col. Atkinson:

"Upon an examination of the books, we agree that Mr. Bernard's report of 38,186 gallons of oil to be charged J. N. Camden on McC., J. & C.'s books is right, except amount of

50 bbls. shipped Bowen & Mercer on the 3d October is to be deucted, which was 2,076 gal. net, or 51 36-40 bbls.

" W. P. Thompson.

" 38,186
  2,076
  ────────
  36,110 "

Complainant McConaughy in his testimony deposed :

" 44th Question—Were not all the books and papers of McConaughy, Jones & Camden transferred to you at the time of the dissolution, and have they not ever since been in your possession ?

" Answer—We got most of the books; I don't think we got them all.

" 45th Question—Was not an accountant employed to examinethe books and papers of the partnership immediately after thedissolution ; if so, who was it?

" Auswer—Yes sir ; we got Col. Hoffman Atkinson.

" 46th Question—Did he report to you the inaccuracy of the 36,110 gallons of oil?

" Answer—Yes, sir.

" 47th Question—How long was he employed in examining the books and papers ?

" Answer—I could not say ; probably a week.

48th Question—How much money did you draw from the partnership for your individual purposes during its continuance ?

" Answer—I am not able to tell without looking at the books.

" 49th Question—Have you not had another settlement subsequent to that of 1867, in which all these matters were considered?

" Answer—No, sir; we have settled the amount in the bank, renewing the papers, &c.

" 50th Question—Was not the 36,110 gallons of oil included in that settlement?

" Answer—It was not included.   I was compelled to give up the certificates or be sold out; but I received no value for .it except as heretofore stated ; they gave me a little over $100.00 at the time I moved up."

Upon the same point W. P. Thompson deposed as follows:

"3d Question—State whether or not you know anything of the dissolution of the partnership of McConaughy, Jones & Camden on the 10th of January, 1867, as set forth in exhibit 'H,' and of the settlement of the books by Hoffman Atkinson; and if so, state what you know about it.

"Answer—I know that there was a dissolution of the co-partnership, and have read to-day exhibit 'H' and recognize it as the paper signed by the parties dissolving it. The only matter between them left unsettled was as to some oil. Subsequently the books were turned over to Hoffman Atkinson, Esq., in connection with N. T. McConaughy, son of complainant, who were selected by Messrs. McConaughy & Jones to thoroughly examine all the books and accounts of the concern. Mr. Schilling, who had been assisting in keeping the books theretofore, Mr. Daniel B. Bernard, who had been superintendent at the oil-yard, and myself gave them all the assistance that he asked, or we could give, in closing up the books, which was done; and the amount of oil, amounting to about 36,110 gallons, was found to be due from firm of Camden to the firm of McConaughy, Jones & Camden. Everything else was fully and satisfactorily settled. After the examination of the books by Mr. Atkinson and N. T. McConaughy everything therein, so far as I know, was satisfactory to all parties concerned, and books, papers and accounts belonging to the firm of McConaughy, Jones & Camden were turned over to McConaughy & Jones, after the settlement aforesaid.

4th Question—Did you sign a certificate in reference to the amount of oil then appearing to be unsettled on the books? If so, state what became of that certificate and how it was settled.

"I signed the certificate attached to exhibit No. 5; and left it with Mr. Hoffman Atkinson as the representative of McConaughy & Jones. It remained in the possession of McConaughy & Jones until after a subsequent and final adjustment of all matters between McConaughy & Jones, J. N. Camden and J. N. Camden & Co,, when that oil matter was included in the settlement and the certificates were delivered to Mr. Camden. The final settlement was March 29, 1869, and

the written agreement of settlement is dated at that time and is marked exhibit 'W,' which was a full and satisfactory settlement to all parties in interest at the time."

W. N. Chancellor, deposed:

"Question 2—Were you present when the contract of agreement of the 29th of March, 1869, exhibit 'W,' was executed? If so state all you know about it.

"Answer—I was present when the settlement was made. There was a full and final settlement between J. N. Camden and McConaughy and Jones, and J. N. Camden and William McConaughy, and J. N. Camden & Co., and McConaughy and Jones.

3d Question—Was or was not the certificate of Colonel Hoffman Atkinson in regard to the 36,110 gallons of oil spoken of and embraced in that settlement?

"Answer—It was."

CROSS-EXAMINATION.

"4th Question—Please to state specifically what your personal knowledge is of said settlement, and what you know in reference to that oil.

"Answer—I was present when it was made; and Mr. McConaughy claimed that there had been a certificate of that oil left out in another settlement. Mr. Camden claimed that the same had been accounted for; and in making this settlement McConaughy had surrendered those certificates."

Exhibit "W," referred to in the foregoing deposition, is as follows:

"This agreement, made this 29th day of March, 1869, between J. N. Camden and J. N. Camden & Co., of the first part, and Wm. McConaughy, for himself and for McConaughy & Jones, of the second part, witnesseth:

"That the following general settlement and agreement of all matters by and between the parties is hereby made: First, reference is hereby had to the agreement, bearing equal date herewith, in reference to the Godwin Van Winkle property and the deed of trust upon the same; second, the said J. N. Camden & Co., being the holders of a deed of trust executed by Wm. McConaughy and John Jones and wife to W. W. Van Winkle, for the benefit of J. N. Camden, dated 10th January, 1867, upon which said deed of trust there remains

unpaid a note—$2,166.66, dated 9th January, 1867, due eight months from date ; also a note for $2,166.66, dated 9th January, 1867, due ten months after date ; also a note for $2,166.-66, dated 9th January, 1867, due twelve months after date, and also a further deed of trust executed by said McConaughy & Jones to E. P. Chancellor, trustee, for the benefit of J. N. Camden & Co., &c., dated 2d March, 1868, upon which said last named deed of trust,the following debts are due at this date, viz., a note of McConaughy & Jones, endorsed by Jordan McMillan, for $1,000.00, dated June 21, 1868, at sixty days, (now in suit) ; also a note for $1,200.00, executed by John Jones to the order of said McConaughy, dated the 2d June, 1868, at sixty days ; also a note for $1,000.00, executed by McConaughy & Jones to the order of J. N. Camden, dated 12th June, 1868, at three months from date ; also a note for $2,919,96, dated March 4, 1869, at twenty days, with interest from date, to the order of J. N. Camden & Co.—all of which said notes have been discounted by the First National Bank, Parkersburg, and constitute the indebtedness of said McConaughy & Jones under said deed of trust at the date hereof : Now, the said McConaughy having purchased the business and obligated himself to pay the debts of said McConaughy and Jones, and in view of an amicable agreement and understanding by and between the parties hereto, the said J. N. Camden & Co., have agreed to extend the time upon which the said deeds of trust may be enforced as hereinafter stated, provided and upon the condition that said McConaughy shall make the payments and reductions on said debts as agreed and herein named, viz., that he shall, within sixty days from the date hereof, pay the sum of $1,000.00, to be applied upon said debts, and shall monthly thereafter pay the sum of $799.37, to be applied upon said debts until the said debts shall fully be paid off, with accru·ing interest ; and in order to the convenient carrying out of this purpose, the said McConaughy and Jones have executed for the debts named in the first deed of trust (dated 10th January, 1867), a note for $7,040.80 to the order of J. N. Camden & Co., dated March 29, 1867, at sixty days, at First National Bank, Parkersburg ; and for the debts named in the second deed of trust, dated March 2, 1868, excepting the one endorsed by McMillan in suit, the said McConaughy &

Jones have executed their note to the order of J. N. Camden
& Co. for $3,966.37, payable at First National Bank, Park-
ersburg, sixty days after date, and McConaughy & Jones to the
the order of Wm. McConaughy for $1,498.78; but it is dis-
tinctly understood these do not include the note for $1,000
endorsed by Jordan McMillan upon which a judgment has
been obtained. The original notes, or the notes described
herein above, are retained as the property and actual evidence
of the indebtedness under the said deeds of trust respectively
at this date, and the new notes are used as being more conve-
nient for purposes of discount by said bank and for renewal,
the said notes having been discounted by said bank heretofore.
Now it is understood that if said McConaughy, or McConau-
ghy & Jones, shall, within sixty days from the date hereof,
pay upon said indebtedness the sum of one thousand dollars,
to be applied to the reduction of said debts, and shall monthly
thereafter pay the sum of $779.37, at the expiration of each
month, to be likewise applied to the reduction or payment of
said debts, that the said deed of trust shall not be executed for
the payment of said debts by the said J. N. Camden & Co. so
long as the payments herein specified are punctually made as
agreed and stipulated for, but it is expressly understood and
agreed that the extension of time will be granted only upon
the condition that the said payments and reductions shall be
made as herein named, and a failure to comply with the con-
ditions of payment will authorize the enforcement of said
trust-deeds for cash for the discharge of the indebtedness se-
cured by them as hereinbefore set forth.

"And it is further fully understood that all matters between
the parties, or between said J. N. Camden and the said Mc-
Conaughy & Jones, prior to the date hereof, of every charac-
ter whatever, have been adjusted, and that there is nothing
outstanding which could be made the subject of defense in the
enforcement of the said trust deeds under this agreement.

"Witness the following signatures this 29th March, 1869.

"J. N. CAMDEN,
"WM. McCONAUGHY,
"McCONAUGHY & JONES.

"Mr. McConaughy is to return to said J. N. Camden the
certificates of Mr. Bernard, Col. Thompson and Mr. Atkin-

son in regard to disputed amount of oil which is hereby included and settled.

"Witness:—S. P. Wells."

As said by the appellees, the written agreement of January 10, 1867, is an instrument signed, sealed and acknowledged by the parties before an officer authorized by law to take acknowledgements. It has all the solemnity of a deed, and in view of the force and character of such a writing, as determined by this court in Peytona Cannel Coal Company vs. Western Mining and Manufacturing Company, 8 West Va. 429, such an instrument is regarded as evidence so strong that only other unequivocal evidence, irresistably conclusive, is sufficient to overthrow it. It seems to me that the proof is irresistable, that every claim and demand was considered by the parties and settled understandingly by them in the agreement of January 10, 1867, and again that the agreement of March 29, 1869, conclusively settled all matters between them. Therefore upon the merits of the case the written evidence shows conclusively a full and complete settlement, and the lapse of time should be a bar to opening up such settlements as between partners. The decree should be affirmed with costs and $30 damages.

The Other Judges Concurred.

Decree Affirmed.